CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 1 5 2016

JULIA C. DUDLEY, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JONATHAN ASHLEY AGEE,<br>    Petitioner, | Civil Action No. 7:15-cv-00367 |
| v. | **MEMORANDUM OPINION** |
| EARL BARKSDALE,<br>    Respondent. | By:  Hon. Michael F. Urbanski<br>       United States District Judge |

      Jonathan Ashley Agee, a Virginia prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge the sentences imposed by the Circuit Court for Montgomery County. Respondent filed a motion to dismiss, and Petitioner responded, making the matter ripe for disposition. After reviewing the record, the court grants the motion to dismiss and dismisses the habeas petition.

**I.**
**A.**

      While a deputy of the Franklin County Sherriff but not in uniform, Petitioner drove his police car from Franklin County, Virginia, into a gas station's parking lot in Roanoke City, Virginia, at approximately 11:28 a.m. on May 30, 2011. Petitioner turned the car's police lights on, which activated the car's dashcam, and parked near Jenny Agee, his ex-wife. Jenny's last words were, "He's going to shoot me," as she watched Petitioner exit the car and carry an M4 Carbine semi-automatic assault rifle toward her. Jenny had no chance to escape, surrounded by parked cars and a high concrete wall and with Petitioner and his assault rifle fifteen feet away.

      Petitioner shot Jenny eight times. The most likely fatal shot was in her back. Bystanders at the gas station watched Petitioner walk back to his police car and drive away before rushing to aid Jenny. Despite their best efforts, Jenny was pronounced dead before noon that Saturday of Memorial Day weekend in 2011.

Also by noon, Virginia State Police Sergeant Matthew Brannock was returning home from his shift to celebrate his thirty-sixth birthday with his parents, wife, and two children when he saw Petitioner driving toward him in the opposite direction along route 460. Sgt. Brannock immediately turned around and pursued him. Sgt. Brannock followed Petitioner, bumper to bumper, as Petitioner weaved through dense holiday traffic on Interstate 81 in Montgomery County, Virginia, at speeds up to 120 miles per hour.

Sgt. Brannock pulled alongside Petitioner when traffic briefly cleared. Petitioner's car sideswiped Sgt. Brannock's car, but Petitioner regained control and stopped the car quickly. Sgt. Brannock's car, however, slid further down the interstate, stopping across the right lane with its trunk toward the guard rail and its hood toward the median, giving Petitioner full sight of the driver side door.

As soon as his car stopped, Sgt. Brannock reported to dispatch, grabbed his pistol, and opened the driver's door in full view of Petitioner. Sgt. Brannock explained:

> I see Mr. Agee already posted up, picture perfect . . . . You are trained to stand when you're shooting at an object. I mean perfect formation . . . . with a rifle. I saw that it was an M-16 or M-4 type rifle, and he was already stationed at the driver's side left corner portion of his police car. [The rifle] was pointed at me. I knew when . . . I saw Mr. Agee standing there . . . . at that moment that his intentions were to kill me . . . .
>
> As soon as I made the turn to get out of my car, I saw Mr. Agee standing there and the shots rang out. And I immediately ducked back into the car. And I remember hearing the round hit the windshield and come right through the door . . . . And my initial thought was, "I got to get the heck out of here," because the shots were still coming, "They are not stopping." It's not like one shot and then time lapses. It's one right after the other . . . . There's plenty of law enforcement officials that can testify that it's the worst possible position. Mr. Agee had the upper hand and the advantage from the word go.
>
> So I fell back in the car and tried to start the car and for some reason it wouldn't start . . . . And in the meantime, I could still hear the rounds

2

hitting the car and hearing the gunshots. . . . [It] was instant death if I stepped outside the car, so my only other option was to go out the passenger side door . . . .

There's a laptop computer there, there's usually an armrest, all the radar mounting and radios, and all that stuff. It's a confined area even for a normal size person, and I'm not a normal sized person obviously, so I knew that my ability to negotiate getting out of this car was going to be a task in and of itself . . . .

As the shots were ringing out and I could hear them hitting the car . . . . It kind of felt like time was slowing down for me. And although all this stuff transpired in just a matter of seconds, to me it felt like that time was going very slow. And I was able to think about how I could prolong my life and what the effects were going to be. But I'd already surmised the fact that, based on the number of rounds that were coming in the car, that I was probably going to die in the car. I just figured I was . . . . And I was just waiting for everything to go black. I figured that I didn't know what it would be like, but I envisioned you wouldn't have another thought, like it would just go black. And so I figured that in just a matter of time it would go black and I wouldn't have to be worried or scared or anything else . . . .

As I continued my exit out of the passenger's side door, I could see the fabric and fibers in slow motion as the bullets are coming into the car as I try to start going out the passenger's side door. It was terrifying. I don't know that terrifying is a good enough word to describe it. But I figured I would die in the car, and I had honestly already given in to that fact. But nevertheless, I was in that fight or flight element where I was trying to preserve life the best I could.

As I crossed the passenger's side seat and reached over to the passenger side door handle and threw that door open, . . . it felt like somebody had hit me in the thigh with a ball peen hammer as hard as they could . . . . The pain was unbelievable . . . . It was just a God awful pain . . . . I didn't stop to look because rounds were still coming in the car, but I put two and two together and figured I'd been shot.

Nevertheless, I continued out the passenger side door . . . . As I did, I put my hands on the ground to brace myself and at the same time I was able to look over my shoulder and try to figure out what Mr. Agee was doing at that particular time because the rounds were still coming in. And – as luck would have it or fate would have it, or thank God it worked out the way it did – . . . it looked like Mr. Agee may have been messing with his gun or doing something. I seized that opportunity and gathered myself up on my hands and got on my feet and immediately just ran towards the guardrail . . . . I've been in law enforcement long enough to know if a man

3

has got a rifle and I've got a pistol, I'm not going to win that fight. You know just by the sheer nature of the performance of a pistol and the distance that was covered, I mean it's just common sense that rifle is a whole lot better weapon and well equipped to handle the situation as spread out as this one.

. . . . So I was sprinting down the embankment towards the tree line, and there at the bottom I lost my footing and fell on a piece of wood and my arm, so it knocked the breath out of me . . . . I figured Mr. Agee . . . would come up and finish me off because I'm lying right there helpless . . . . I was able to catch my breath. I re-holstered my weapon . . . and decided that it would be my best interest to try to get to higher ground where I was camouflaged somewhat and so he wouldn't be able to pick me out as easily if I'm standing right there in the wide open.

At this particular point the pain is really kicking in. And I look at this hillside and understand that that's really the only chance that I have to get away or to camouflage myself or get in a position where I can fire. So the best as I could on my hands and knees, I just start grabbing on to these trees and pulling myself up into the tree line as far as I could. At the same time, I'm hearing the shots come in the trees behind me, and I wasn't sure what was going on . . . . I thought I'd get shot in the back up on there. And so I just continued up in there and got all the way to one of those highway marker fences that run along the interstate . . . .

Once I reached that fence line I knew at that particular point I was helpless, that I was pinned because based on the pain and being out of breath and just completely exhausted, I knew that I couldn't get over that fence. And I figured just hearing the rounds coming through the trees that I felt like Mr. Agee was probably coming up in the woods behind me. So I just found the biggest tree that I could and I just turned around and sat down . . . .

I figured I would see what the pain was actually coming from, and when I looked down, I could see that my pants were soiled on the side with blood. And I didn't realize at that time that I had actually been shot twice . . . .

That whole movie thing about how your life flashes before your eyes didn't really happen to me. However, I thought about my kids and thought the totality of the event . . . . I thought about my kids and my wife and how they looked forward to me coming home every day and they would ask me before I left to go to work, "Daddy, when are coming home? Are you going to come for lunch? Are you going to stop by the house?" They were always interested in when I'd be home. And I'm thinking of all days, this is the day that I never thought would come. I envisioned that there was a possibility I could be shot at some particular time in my career but not under these circumstances . . . .

4

> The only thing I could do was surmise enough energy to take my gun back out and unbutton my ammo pouches. I figured if he was going to come up in the woods after me then we would just have a shoot out at the OK Corral, we could just shoot until there weren't any more rounds, and that is just the way it was going to have to be.
>
> After a few minutes passed, I couldn't see anything moving that would be synonymous with somebody trying to sneak up on you .... I knew I was bleeding and that I was really exhausted. And I knew that I had to do something to put myself in a position to try and get some help .... And that's what I proceeded to do, just work my way back down the mountain to just run it in reverse. I came to the tree lines were I had fallen initially coming down. I'm looking at that embankment and it looks like Mount Everest at this particular point ....

(Sent. H'rg Tr. 56-80.)

Sgt. Brannock crawled back up that embankment and survived his thirty-sixth birthday. Shrapnel from the first bullet stopped too closely to an artery to remove, and the second bullet lodged into his pelvic bone.

After Sgt. Brannock had survived by jumping over the guardrail, Petitioner had briefly walked toward Sgt. Brannock's car, saw nothing moving, and then returned to his car. Petitioner drove his damaged car a short distance down the interstate before parking at the top of the next exit ramp.

Sgt. Becky Curl was driving past Sgt. Brannock's shot-up, abandoned car when she came upon a red car that had its back window shot out from one of Petitioner's bullets. The driver told her that a deputy's police car drove past, and after driving a little farther up the interstate, Sgt. Curl and another trooper found Petitioner standing outside his car parked at the top of the exit ramp. Sgt. Curl recounted:

> My immediate encounter with Agee was that he was yelling at me to shoot him and he couldn't live with what he did .... I talked to him as long as I could possibly talk to him to have him surrender his weapon and surrender himself. His posture didn't give. His body language, his posture, and his

> behavior, his voice even – there was absolutely nothing in my being that believed one thing that he was saying. The way that he held that weapon and the way that he kept readjusting his grip, there is no doubt in my mind what his plan was . . . .
>
> I was trying to get myself in a better position tactically, one to make the shot. I was at a significant distance when I exited my car, and the whole time that we were talking, I was attempting to close that distance. And he was closing the distance as well. He's a trained police offer. I'm a trained police officer. You know neither one of us are at a loss about what's getting ready to happen . . . .
>
> He was agitated, irritated the further that we went; the more I talked, the angrier he got . . . . His hands were at his rifle, which was pointed up in the air. And everyone just saw the same thing that I saw with the exception of the last time that he readjusted his grip: he also bladed his body towards me . . . so he would be shoulder to shoulder to me versus . . . his shoulders . . . pointed straight down the exit ramp. It's a very minute change in his body, change and adjustment in his hand and his arm. Everything simultaneously happens . . . . I'm not going to wait to see what happens next. I know what's coming . . . . I got my rounds off and I dove into the berm of the dirt. There was no cover there . . . .

(Id. at 158-63.)

Sgt. Curl heard Petitioner's shots flying past her as she fell to the ground and rolled to her right. Once the shooting stopped, Sgt. Curl cautiously approached Petitioner's bloodied body lying on the road and on top of the rifle. She retrieved the rifle and began emergency medical treatment for the significant bullet wound to Petitioner's chest. Sgt. Curl likely saved Petitioner's life by rolling him on his side to prevent him from choking on the blood draining out of his mouth, and as he lay there, Petitioner complemented Sgt. Curl on her police work: "You did a good job. I was going to kill you."

### B.

Petitioner pleaded nolo contendere ("no contest") to murder in the first degree and use of a firearm for his acts in Roanoke City. Petitioner also pleaded no contest to attempted capital

6

murder of a law enforcement officer, aggravated malicious wounding, use of a firearm during the commission of a felony, and felony eluding for his acts in Montgomery County. These pleas were pursuant to two written plea agreements with the Commonwealth's Attorneys for Roanoke City and for Montgomery County. The plea agreements recited that the Commonwealth's Attorney for Montgomery County would nolle pros one charge using a firearm in the commission of a felony and that Commonwealth's Attorney for Roanoke City would nolle pros three charges of shooting into an occupied vehicle. The Plea Agreement with the Commonwealth's Attorney for Roanoke City also noted that the government would seek the maximum penalty – life imprisonment plus three years – for the crimes charged in Roanoke.

During his plea colloquy in the Circuit Court for Montgomery County, Petitioner testified that he understood the charges, discussed the charges and their elements with counsel, and had enough time to speak with counsel about any possible defenses. Notably, Petitioner testified that he was entirely satisfied with counsel's services by that time and that pleading no contest was his own decision. Petitioner acknowledged that, by pleading no contest, he waived all non-jurisdictional claims and defenses and the rights to defend himself, to a jury trial, and to confront witnesses. Petitioner also testified that the plea agreement constituted the entire agreement and that no one had made any promises to him other than what was described in the plea agreement.

On May 7 and 8, 2013, a joint sentencing hearing for the convictions from both circuit courts was held by the Circuit Court for Roanoke City. As mitigation evidence, Petitioner played a lengthy video deposition of a professor of psychiatry from Harvard Medical School, who after interviewing Petitioner, his parents, and his wife, gave the opinion that the murder would not have happened but for Petitioner's "roid rage" from using anabolic steroids. The circuit court was not swayed by the testimony and sentenced Petitioner to life imprisonment plus

7

eight years for the attempted murder, aggravated malicious wounding, felony eluding, and use of a firearm in Montgomery County. Petitioner did not appeal.

## C.

The Supreme Court of Virginia dismissed Petitioner's first habeas petition without prejudice because it improperly challenged convictions from both circuit courts. The Supreme Court of Virginia accepted Petitioner's second petition that challenged just the convictions from the Circuit Court for Montgomery County and ordered Petitioner's warden to respond. After considering the warden's motion to dismiss, the Supreme Court of Virginia dismissed the second habeas petition.

Thereafter, Petitioner timely filed the federal petition. Petitioner presents the following four main claims about his convictions from Montgomery County:

1. Fraud on the court due to the court intentionally withholding exculpatory evidence by not testing the bullets shot into Sgt. Brannock and not allowing an expert witness from Harvard University testify on Petitioner's behalf;

2. The life sentences for attempted capital murder and aggravated malicious wounding violated:

   a. The Double Jeopardy Clause of the Fifth Amendment;

   b. The Eighth Amendment; and

   c. The Equal Protection Clause of the Fourteenth Amendment;

3. Counsel rendered ineffective assistance by:

   a. Not objecting to the elevation of his indictment to first-degree murder;

   b. Advising Petitioner to plead no contest despite the availability of a medical defense;

   c. Advising Petitioner to plead no contest and promising him that he would receive a sentence of thirty-five years' incarceration;

   d. Not having the bullets from Sgt. Brannock's body tested;

8

e. Not objecting when the Commonwealth asked for a life sentence;

   f. Not advising Petitioner that he could withdraw his no contest pleas; and

   g. Not objecting when the court refused to allow his expert to testify; and

4. Exculpatory evidence was not given to Petitioner due to the malicious prosecution resulting from the prosecutor:

   a. Violating the Double Jeopardy Clause; and

   b. Asking for a life sentence after agreeing to a thirty-five year sentence.

Respondent argues that these claims are either procedurally defaulted or meritless, and after reviewing the record, the court agrees. Accordingly, Respondent's motion to dismiss is granted, and the petition is dismissed.

## II.
### A.

The court finds that claims 3(a), 3(b), and 3(f) are unexhausted. A federal court "may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000); see O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). The state habeas record reveals that Petitioner did not present these claims to the Supreme Court of Virginia.

### B.

The unexhausted claims 3(a), 3(b), and 3(f) must be treated as procedurally defaulted. "A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000) (citing Gray v. Netherland, 518 U.S. 152, 161 (1996)). "[T]he exhaustion

9

requirement for claims not fairly presented to the state's highest court is technically met when . . . a state procedural rule would bar consideration if the claim was later presented to the state court." Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997) (citations omitted), overturned on other grounds by Miller-El v. Dretke, 545 U.S. 231, 241 (2005).

Although presented to the Supreme Court of Virginia, claims 1, 2(b), 2(c), 3(e), 3(g), and 4(b) must also be treated as procedurally defaulted. A petitioner procedurally defaults a federal habeas claim when "a state court has declined to consider the claim's merits on the basis of an adequate and independent state procedural rule." Hedrick v. True, 443 F.3d 342, 359 (4th Cir. 2006). The Supreme Court of Virginia court dismissed claims 1, 2(b), 2(c), 3(e), and 3(g) as successive because the facts upon which the claims were based were known prior to the first state habeas petition but were not raised in this first petition. Agee v. Wright, No. 141260, slip op. at 2-3 (Va. Mar. 9, 2015) (citing Va. Code § 8.01-654(B)(2) and Dorsey v. Angelone, 261 Va. 601, 604, 544 S.E.2d 350, 352 (2001)). The Supreme Court of Virginia court dismissed claim 4(b) pursuant to Slayton v. Parrigan, 215 Va. 27, 29, 205 S.E.2d 680, 682 (1974), because the non-jurisdictional claim could have been raised at trial or on direct appeal but was not. Id. at 4.

Virginia Code § 8.01-654(A)(2) and (B)(2) would now bar the Supreme Court of Virginia's consideration of claims 1, 2(b), 2(c), 3(a), 3(b), 3(e), 3(f), 3(g), and 4(b) if Petitioner now attempted to present them to the Supreme Court of Virginia. See, e.g., Fisher v. Angelone, 163 F.3d 835, 844 (4th Cir. 1998) (discussing the adequate and independent nature of Slayton); Mackall v. Angelone, 131 F.3d 442, 446 (4th Cir. 1997) (discussing the adequate and independent nature of § 8.01-654); O'Dell v. Netherland, 95 F.3d 1214, 1243 (4th Cir. 1996) (same).

10

## C.

A federal court may not review a procedurally defaulted claim absent a showing of cause and prejudice or a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 750 (1991). The existence of cause ordinarily turns upon a showing of ineffective assistance of counsel, a factor external to the defense that impeded compliance with the state procedural rule, or the novelty of the claim. Id. at 753-54; Clozza v. Murray, 913 F.2d 1092, 1104 (4th Cir. 1990). Errors of counsel may serve as cause, but only if a petitioner demonstrates (1) that the errors were so egregious that they violated petitioner's constitutional right to effective assistance of counsel, and (2) that ineffective assistance claim itself is exhausted and not procedurally defaulted. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000); see Martinez v. Ryan, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012) (creating a limiting qualification to Coleman for "substantial" claims of ineffective assistance of trial counsel where the cause was either no counsel or ineffective assistance of counsel during the initial state collateral proceeding). A petitioner's unfamiliarity with law or a court's procedural rules does not provide a basis for establishing cause. See, e.g., Harris v. McAdory, 334 F.3d 665, 668-69 (7th Cir. 2003) (finding that a petitioner's pro se status does not constitute adequate ground for cause). "Prejudice" means that the alleged error worked to a petitioner's "actual substantial disadvantage, infecting his entire trial with error of constitutional dimensions." McCarver v. Lee, 221 F.3d 583, 592 (4th Cir. 2000) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)); see Kornahrens v. Evatt, 66 F.3d 1350, 1359 (4th Cir. 1995) (noting a court does not need to consider the issue of prejudice in the absence of cause).

Petitioner fails to establish cause and prejudice or a fundamental miscarriage of justice to excuse any procedural default. There is no merit to claim 1 arguing fraud upon or fraud by the

11

circuit court, claim 2 arguing that his sentence violates the Eighth Amendment or Equal Protection clause of the Fourteenth Amendment, or claim 4(b) arguing he was maliciously prosecuted because of the life sentences.

Also, claims 3(a), 3(b), 3(e), 3(f), and 3(g) do not present a "substantial" claim of ineffective assistance of counsel. A petitioner claiming ineffective assistance of counsel must satisfy the two-pronged test set forth in Strickland v. Washington, 466 U.S. 668, 671 (1984). The first prong of Strickland requires a petitioner to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" meaning that counsel's representation fell below an objective standard of reasonableness.[1] Strickland, 466 U.S. at 687-88. The second prong of Strickland requires a petitioner to show that counsel's deficient performance prejudiced him by demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[2] Id. at 694. A petitioner who pleaded guilty must demonstrate that, but for counsel's alleged error, there is a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial. Hill v. Lockhart, 474 U.S. 52, 59 (1985).

---

[1] "[A]n attorney's acts or omissions that are not unconstitutional individually cannot be added together to create a constitutional violation." Fisher v. Angelone, 163 F.3d 835, 852-53 (4th Cir. 1998) (internal quotation marks omitted). Strickland established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Strickland, 466 U.S. at 689. "Judicial scrutiny of counsel's performance must be highly deferential[,]" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. "[E]ffective representation is not synonymous with errorless representation[.]" Springer v. Collins, 586 F.2d 329, 332 (4th Cir. 1978).

[2] If a petitioner does not satisfy one of the prongs, a court does not need to inquire whether the petitioner satisfied the other Strickland prong. Id. at 697.

12

Petitioner does not establish cause and prejudice for claim 3(a) about the indictment for murder from the Circuit Court for Roanoke City. This claim is not applicable to this petition challenging the convictions from the Circuit Court for Montgomery County.

In claim 3(b), Petitioner argues counsel was ineffective for allowing him to plead no contest despite an available defense about his mental condition. Counsel presented mitigation evidence during sentencing via a video deposition of an expert witness who discussed how steroids affected Petitioner's mental state. Nonetheless, Virginia law does not permit a legal defense for a mental defect less than insanity or extreme intoxication. See Stamper v. Commonwealth, 228 Va. 707, 717, 324 S.E.2d 682, 688 (1985) ("[E]vidence of a criminal defendant's mental state at the time of the offense is, in the absence of an insanity defense, irrelevant to the issue of guilt."); Waye v. Commonwealth, 219 Va. 683, 698, 251 S.E.2d 202, 211 (1979) (holding a voluntary intoxication defense applies only to a specific intent to commit a crime when a defendant "was so intoxicated as to render him incapable of any willful, deliberate and premeditated act"). Petitioner's acts demonstrated planning and premeditation and, thus, precluded an intoxication defense.

There is no merit to claim 3(e). In claim 3(e), Petitioner faults counsel for not objecting when the prosecutor told the trial court that the Commonwealth sought a life sentence. Petitioner believes counsel should have objected because the prosecutor solicited the pleas of no contest for a sentence of thirty-five years' incarceration. Petitioner testified during the plea hearing that the decision to plead no contest was his own decision, the plea agreement constituted the entire agreement, and no one had made any promises to him other than what was described in the plea agreement. The only relevant promise in the plea agreement from the Commonwealth's Attorney for Montgomery County was to nolle pros one charge of using a firearm in the

13

commission of a felony. Petitioner testified that he and the Commonwealth's Attorney for Montgomery County had not agreed upon a sentence, that the circuit court could impose a sentence up to the maximum allowed, and that he understood the maximum sentence was life imprisonment plus eight years. Not making a frivolous objection can neither be deficient performance nor result in actual prejudice, and Petitioner fails to establish how counsel's alleged failure to "obtain [and] review all material" would have resulted in him proceeding to trial.

Petitioner argues in claim 3(f) that counsel was ineffective for not advising him that he could withdraw his pleas of no contest. The record reflects Petitioner entered his no contest pleas knowingly and voluntarily, and he does not present any sufficient basis for which he could have successfully sought to withdraw the pleas. See, e.g., Parris v. Commonwealth, 189 Va. 321, 324-25, 52 S.E.2d 872, 873-74 (1949) (discussing the possible bases to permit withdrawing a plea indicating guilt).

In claim 3(g), Petitioner argues counsel erred by not objecting when the defense expert was not permitted to testify. However, the expert's report was accepted as evidence for the sentencing hearing, and the circuit court watched the video deposition of the expert during the sentencing hearing. Petitioner fails to establish what other defense expert was precluded from testifying. Accordingly, claims 1, 2(b), 2(c), 3(a), 3(b), 3(e), 3(f), 3(g), and 4(b) are dismissed as procedurally defaulted.

### IV.

The Supreme Court of Virginia's dismissal of claims 2(a), 3(c), 3(d), and 4(a) does not warrant federal habeas relief. After a state court addresses the merits of a claim also raised in a federal habeas petition, a federal court may not grant the petition unless the state court's adjudication of a claim is contrary to, or an unreasonable application of, clearly established

14

federal law or based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 180-81 (2011).

The evaluation of whether a state court decision is "contrary to" or "an unreasonable application of" federal law is based on an independent review of each standard. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413.

A federal court may issue the writ under the "unreasonable application" clause if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. This reasonableness standard is an objective one. Id. at 410. A Virginia court's findings cannot be deemed unreasonable merely because it does not cite established United States Supreme Court precedent on an issue if the result reached is not contrary to that established precedent. Mitchell v. Esparza, 540 U.S. 12, 16 (2003).

A federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El, 545 U.S. at 240 (quoting 28 U.S.C. § 2254(e)(1)). Finally, "[a] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

15

**A.**

Claims 2(a) and 4(a) must be dismissed in accordance with § 2254(d). The Supreme Court of Virginia held that Petitioner's voluntary and intelligent plea waived all non-jurisdictional defenses that could have been raised before the guilty pleas. Agee, No. 141260 at 3 (citing Peyton v. King, 210 Va. 194, 196-97, 169 S.E.2d 569, 571 (1969)). This holding is not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.[3]

> A plea of guilty and the ensuing conviction comprehend all of the factual and legal elements necessary to sustain a binding, final judgment of guilt and a lawful sentence. Accordingly, when the judgment of conviction upon a guilty plea has become final and the offender seeks to reopen the proceeding, the inquiry is ordinarily confined to whether the underlying plea was both counseled and voluntary. If the answer is in the affirmative then the conviction and the plea, as a general rule, foreclose the collateral attack.

United States v. Broce, 488 U.S. 563, 569 (1989); see Zant v. Stephens, 462 U.S. 862, 886 (1983) (equating guilty pleas to pleas of no contest for sentencing purposes); Ellis v. Dyson, 421 U.S. 426, 441 (1975) (same); North Carolina v. Alford, 400 U.S. 25, 37 (1970) (same); cf. Blockburger v. United States, 284 U.S. 299, 304 (1932) (discussing the test for double jeopardy claims). Consequently, 2(a) and 4(a) must be dismissed as waived pursuant to Petitioner's pleas of no contest.

**B.**

Claims 3(c) and 3(d) must also be dismissed in accordance with § 2254(d). In claim 3(c), Petitioner argues counsel rendered ineffective assistance for advising him to plead no contest

---

[3] The Supreme Court of Virginia determined that Petitioner's plea was knowing and voluntary, a conclusion that Petitioner does not attack via a separate claim or establish to be based on an unreasonable determination of facts.

16

because of a promise Petitioner would be sentenced to thirty-five years' incarceration. The Supreme Court of Virginia dismissed these claims as waived and contrary to the record:

> [P]etitioner failed to offer a valid reason why he should not be bound by his representation at trial that his counsel's performance was adequate, that no one had made him any promises outside the plea agreement, and that the plea agreement did not contain any agreement concerning the sentence or disposition of petitioner's charges.

Agee, No. 141260 at 3, 4 (citing Anderson v. Warden, 222 Va. 511, 516, 281 S.E.2d 885, 888 (1981)).

The Supreme Court of Virginia's dismissal of claims 3(c) and 3(d) is not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. In Blackledge v. Allison, 431 U.S. 63, 73-74 (1977), the Supreme Court of the United States determined that:

> [T]he representations of the defendant, his lawyer, and the prosecutor at . . . a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Petitioner did not present more than conclusory allegations to the Supreme Court of Virginia in support of claim 3(c). In contrast, Petitioner testified during the plea hearing that the decision to plead no contest was his own decision, the plea agreement constituted the entire agreement, and no one had made any promises to him other than what was described in the plea agreement. The only relevant promise in the plea agreement from the Commonwealth's Attorney for Montgomery County was to nolle pros one charge of using a firearm in the commission of a felony. Petitioner testified that he and the Commonwealth's Attorney for Montgomery County had not agreed upon a sentence, that the circuit court could impose a

17

sentence up to the maximum allowed, and that he understood the maximum sentence was life imprisonment plus eight years. Accordingly, claim 3(c) must be dismissed.

Although Petition believes in claim 3(d) that ballistics testing would have proved he did not fire the bullets that struck Sgt. Brannock, he offers nothing but his own conjecture in support of the claim. Furthermore, Petitioner acknowledged by pleading no contest that he waived his right to defend himself and challenge the Commonwealth's case. Nonetheless, the record reflects that the bullets were left in Sgt. Brannock for medical reasons, and the evidence was otherwise sufficient to sustain the malicious wounding conviction.[4] Accordingly, claim 3(d) must also be dismissed.

V.

For the foregoing reasons, the court grants Respondent's motion to dismiss and dismisses the petition for a writ of habeas corpus. Based upon the court's finding that petitioner has not made the requisite substantial showing of a denial of a constitutional right as required by 28 U.S.C. § 2253(c) and Slack v. McDaniel, 529 U.S. 473, 484 (2000), a certificate of appealability is denied.

ENTER: This 14th day of June, 2016.

/s/ Michael F. Urbanski
United States District Judge

---

[4] Only Petitioner was shooting into the police car when Sgt. Brannock was shot.